UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROLYN DIXON, as Next Friend for
CHAKIA DIXON, a Minor, and
CHANEL DIXON,

                 Plaintiffs,                      Case No. 10-cv-11126

                                                      Paul D. Borman
v.                                         United States District Judge

CITY OF EASTPOINTE, DEREK
McLAUGHLIN and JOHN ANGE,

                 Defendants.
_____/

OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 38)

      This matter is before the Court on Defendants City of Eastpointe and Derek McLaughlin's

Motion for Summary Judgment.[1]  (Dkt. No. 38.)  Plaintiffs filed a response (Dkt. No. 52) and

Defendants filed a reply (Dkt. No. 55.)  The Court held a hearing on June 5, 2012.  For the reasons

that follow, the GRANTS Defendants' motion.

**INTRODUCTION**

      This civil rights and negligence action involves a long history of ill-will between the

daughters of two families, the Dixons and the Hendersons.  On several occasions, incidents between

the girls (and sometimes their respective mothers) escalated to the point of necessitating the

_____

[1] Defendant John Ange, the City of Eastpointe prosecutor who approved the warrant request in the instant case, was dismissed with prejudice by stipulated order entered on November 11, 2011. (Dkt. No. 37, Stipulated Order of Dismissal with Prejudice of Defendant John Ange.)

intervention of the City of Eastpointe police.  The cause of the intensified feuding that forms the

basis for this action appears to have been one particular incident in which one of the Henderson girls

struck one of the Dixon girls in the face, resulting in injuries that necessitated medical treatment and

stitches.  Although the Henderson girl was criminally charged and did receive punishment, it would

appear that the Dixons never felt fully vindicated and episodes of harassing behavior continued.

Ultimately, a warrant and petition (one of the Dixon girls was a minor at the time) issued for the

arrests of the Dixon girls on charges of stalking the Hendersons.  Both Dixon girls were arrested on

the charges, which subsequently were dismissed without prejudice for lack of sufficient evidence.

The Dixons now claim in this suit that the City of Eastpointe detective who requested the

criminal complaint for stalking, Detective Derek McLaughlin, gave knowingly false information in

support of the warrant that resulted in the false arrest and false imprisonment of the Dixon girls.  The

Dixons also sue the City of Eastpointe for its alleged involvement in the actions of its employees

in bringing about the arrest of the Dixon girls.  Detective McLaughlin and the City of Eastpointe

now move for summary judgment.

## I.      FACTUAL BACKGROUND

In the late afternoon on June 30, 2007, Plaintiffs Chakia and Chanel Dixon arrived at the

home of the Henderson sisters, Nicole and Dominique, and a fight broke out between the sisters.

(Defs.' Mot. Ex. 1, 6/30/07 Eastpointe PD Crime Report, hereinafter "the 6/30/07 Report.")

According to the 6/30/07 Report, Nicole Henderson struck Chanel Dixon in the head with an

unknown object, causing a laceration that required medical attention, stitches and a tetanus shot.

*Id*.  The 6/30/07 Report was prepared by responding officer Randy Diegel.  *Id*.  The case was

assigned for follow-up to Detective Derek McLaughlin, who petitioned the Macomb Prosecuting

2

Attorney to charge Nicole Henderson with aggravated assault.  (Defs.' Mot. Ex. 2, Request to Petition.)  Henderson ultimately pled guilty to felonious assault and was placed on probation. (Pls.' Mot. Ex. 2, 3/20/08 Memorandum from McLaughlin to Lieutenant Borowsky, 2.)

On September 4, 2007, Officer Sommerfeld of the Eastpointe Police Department was summoned to the Henderson home to respond to a reported assault.  (Defs.' Mot. Ex. 3, 9/5/07 Report, hereinafter "the 9/5/07 Report.") Officer Sommerfeld noted in his report that in a prior incident (referring to the June 30, 2007 incident) Nicole Henderson was the suspect in an assault on Chanel Dixon.  *Id.*  Officer Sommerfeld explains in his report that the Henderson sisters reported that a vehicle occupied by Chanel and Chakia  Dixon and others had pulled up beside the Henderson girls while they were walking down the street, words were exchanged and Chanel said she was going to pick someone up and would be back.  The car returned a minute or so later and two individuals (cousins of the Dixons) exited the vehicle and began to assault Nicole Henderson.  The suspects got back in the car, fled, and a few minutes later the vehicle pulled up along side the Henderson girls again, this time occupied by Chanel and Chakia's mother, Carolyn Dixon, who told the Henderson girls their mouths were going to get them in trouble and to have their mother call her.  *Id.*  After taking the report from the Hendersons, Officer Sommerfeld proceeded to the Dixon home, where an individual matching the description of one of the individuals alleged to have assaulted Nicole Henderson (a black female albino) was sitting on the front porch.  *Id.*  The Dixons and the cousin denied any knowledge of the alleged attack, although Carolyn Dixon did advise Officer Sommerfeld that she told Nicole to have her mother contact Mrs. Dixon.  *Id.*  The Dixon's cousins ultimately were charged with felonious assault.  (Pls.' Resp. Ex. 2, 3/28/08 McLaughlin Memo 2.)

According to Officer Sommerfeld's 9/5/07 Report, on September 5, 2007, Dominique

3

Henderson reported to Officer Sommerfeld that she was being harassed and threatened at school and that Chakia Dixon was going to "jump her." *Id.*  She also reported that Carolyn Dixon had passed Dominique in the hallway at school that day and intentionally hit Dominique with her purse. *Id.* In her deposition, Chanel Dixon denied any knowledge of the September 4, 2007 incident described in Officer Sommerfeld's report. (Defs.' Mot. Ex. 4, Deposition of Chanel Dixon, June 30, 2011, 102:22-104:20.)  Chanel did recall, however, that the police came to her home that day and questioned her cousin about the incident. *Id.* at 105:20-106:12.  Plaintiffs allege that on September 4, 2007, Chakia was harassed all day at school by Nicole and Dominique Henderson, and others, resulting in Carolyn Dixon visiting the principal's office on September 5, 2007 to report the harassment. (Pls. Resp. 1; Ex. 28, Plaintiffs' Interrogatory Responses.)  Plaintiffs allege that the principal never followed up on the Dixon's Complaints. *Id.*

On September 11, 2007, Officer Jason Gibson received a visit at the police station from Joyce Henderson, the mother of Nicole and Dominique, who reported that Mrs. Henderson and her daughter Nicole were approached by Carolyn Dixon (Chanel and Chakia's mother) at the school that morning and that Mrs. Dixon threatened Nicole and asked her to "step outside" so "we could finish this." (Defs.' Mot. Ex. 5, 9/11/07 Eastpointe PD Crime Report "Intimidation/Stalking" 1.) According to Mrs. Henderson, this incident was witnessed by the principal's secretary. *Id.* After receiving this report, Officer Gibson went to the girls' school and patrolled the area, locating Carolyn Dixon in the parking lot.  Mrs. Dixon denied making any threats to Nicole or Mrs. Henderson and stated that there had been ongoing trouble between her girls and the Henderson girls since Nicole Henderson assaulted her daughter Chanel the previous summer. *Id.*  Before leaving the school, Officer Gibson confirmed with the principal's secretary that she had witnessed Carolyn

Dixon ask Nicole to step outside after school. *Id*.

On September 19, 2007, Officer Konal was called to the Dixon home on a report that Nicole Henderson had thrown a bottle at Carolyn Dixon's car that was parked in front of the Dixon's home. (Pls.' Resp. Ex. 20, 9/19/07 Eastpointe Crime Report "Suspicious Circumstances.")  According to the report, Nicole Henderson was a passenger in Tiara Bush's car when the two drove by the Dixon home and exchanged words with Chanel Dixon.  Henderson then threw a plastic bottle at Mrs. Dixon's car.  Officer Konal then went to the Henderson home and interviewed Bush and Nicole Henderson, who admitted that they did drive by the Dixon home and that Nicole did throw a plastic bottle at the Dixon's car. *Id*.

On September 25, 2007, Carolyn Dixon filed a Citizen's Complaint Report against Officer Gibson and an unidentified female officer, alleging that Gibson and the female officer had harassed her in the school parking lot on September 12, 2007 (referring to the above incident as described in Officer Gibson's 9/11/07 Crime Report).  (Pls.' Resp. Ex. 11, 9/25/07 Citizen's Complaint against Officer Gibson.)  Mrs. Dixon alleges in the Citizen's Complaint that Officer Gibson and his partner circled her daughter's vehicle that was parked in the school lot and then approached Mrs. Dixon in her truck and asked to speak to her about "resolving an issue with the girls." *Id*.  The Complaint then alleges that the very next day, Officer Gibson came back to the parking lot and ran Mrs. Dixon's plates on her "06-Impala." *Id*.  At the same time that Mrs. Dixon swore out the Citizen's Complaint against Officer Gibson, she also filed a Citizen's Complaint against Detective McLaughlin, alleging that he harassed her daughter outside of a strip mall on September 14, 2007. (Pls.' Resp. Ex. 11, 9/25/07 Citizen's Complaint against McLaughlin.)

On October 17, 2007, Lieutenant Borowsky prepared a memo to Inspector John Calabrese

regarding Mrs. Dixon's 9/25/07 Citizen's Complaint against Detective McLaughlin.  (Pls.' Resp. Ex. 19; Defs.' Reply Ex. 22.)  Lieutenant Borowsky reviewed the written complaint and spoke on the phone to Carolyn Dixon, explaining to her that Detective McLaughlin was a plain clothes detective and that her daughter was not legally parked in the strip mall parking lot at the time that Detective McLaughlin approached her.  Mrs. Dixon explained that her daughter had been expelled from school and so was not able to park in the school parking lot in order to pick her sister up from school.  Lieutenant Borowsky explained to Mrs. Dixon that the strip mall parking lot is for customers only and her daughter should not park there in the future.  Lieutenant Borowsky explained to Mrs. Dixon that Detective McLaughlin had been told not to contact the Dixon daughters in the future unless he is investigating a criminal matter.  *Id.*  Lieutenant Borowsky also advised Mrs. Dixon that a warrant for Nicole Henderson had been authorized in connection with the June 30, 2007 assault of Mrs. Dixon's daughter Chanel and that Detective McLaughlin was working on getting Ms. Henderson to surrender on the warrant.  (*Id.*)  Lieutenant Borowsky indicated in his memo that Mrs. Dixon "seemed to be satisfied with the outcome in this matter."  *Id.*  In December, 2007, Nicole Henderson pled guilty to the charges of assaulting Chanel Dixon, was placed on a tether for 30 days, performed community service, paid restitution and was placed on probation. (Defs.' Reply, Ex. 18, Transcript of March 17, 2008 Hearing, 4-5.)

On January 10, 2008, Officer Todd Murdock was called to the Henderson home regarding an incident involving the Dixon sisters.  Nicole Henderson reported that she was walking home from school when Chanel drove past and gave Nicole the "middle finger."  (Defs.' Mot. Ex. 6, 1/10/08 Eastpointe Crime Report "Intimidation/Stalking.")  Nicole reported that Chanel and Chakia yelled that they were going to "kick[Nicole's] ass."  Nicole called her mother and continued walking home.

Mrs. Henderson came out of the Henderson home and told Nicole to get inside. Mrs. Henderson reported that Chakia leaned out of the car and stated that they were going to kick Nicole's ass and then kick Mrs. Henderson's ass. *Id.* Mrs. Henderson wrote down the license plate of the vehicle, which was a Chevy Trailblazer registered to Carolyn Dixon. *Id.* In her deposition, Nicole Henderson testified about this incident, which she termed "stalking," and stated that she felt intimidated by the Dixons and that she and her sister had begun taking alternate routes home from school but that the Dixons seemed to "just ride through the neighborhood" looking for them. (Defs.' Mot. Ex. 7, Deposition of Nicole Henderson, August 3, 2011 38:12-41:10.) Ultimately, according to Nicole, Mrs. Henderson took Nicole and Dominique out of East Detroit High School[2] because of altercations with the Dixon family. *Id.* 48:16-22.

On February 6, 2008, Officer Randy Diegel responded to the Henderson home on reports of a large fight involving black females. (Defs.' Mot. Ex. 8, 2/6/08 Eastpointe Crime Report "Intimidation/Stalking.") While Officer Diegel was enroute to the Henderson home, responding units were advised that two black female suspects had fled the scene in a purple Chevy Trailblazer. *Id.* According to the report, Mrs. Joyce Henderson informed Officer Diegel that the suspects, Chanel and Chakia Dixon, driving the Chevy Trailblazer, pulled in front of the Henderson home and blocked a car that was occupied by a group of the Henderson girls' friends. Chanel and Chakia exited their vehicle and "began yelling/screaming/taunting/antagonizing the subjects in the vehicle, as well as Nicole and Dominique." *Id.* Mrs. Henderson indicated that Chanel and Chakia were attempting to instigate a physical altercation, saying things like "come on let's go right now." The altercation never became physical and Chanel and Chakia re-entered their vehicle and fled the scene.

---

[2] Defendant City of Eastpointe was previously called East Detroit.

*Id.* Mrs. Henderson explained to Officer Diegel that one of her daughters had already been criminally charged and completed her probation as a result of an earlier altercation with the Dixon sisters and that she (Mrs. Henderson) wanted this whole thing to end. *Id.* Mrs. Henderson indicated to Officer Diegel that she wanted to obtain personal protection orders against Chanel and Chakia to protect her daughters and herself.

After taking the report from the Hendersons, Officer Diegel proceeded to the Dixon home where Officer Sommerfeld was already on the scene and had observed Chanel and Chakia arrive at home in the Chevy Trailblazer. *Id.* When asked if they had been involved in the altercation at the Henderson home, both Chanel and Chakia laughed and denied being on the street. Mrs. Dixon advised Officer Diegel that he was not to speak to her daughters but should talk to her instead. Officer Diegel informed Mrs. Dixon that she was not involved and that he would be talking directly with Chanel and Chakia. Chanel and Chakia were advised that they were not welcome on the Henderson's property and that a personal protection order was going to be sought. *Id.* While Officer Diegel was speaking with Chanel, Chakia advised Chanel not to answer or talk to Officer Diegel. *Id.*

On February 22, 2008, Macomb County Prosecutor John Ange approved a Request to Petition, submitted by Detective McLaughlin, authorizing the filing a complaint of stalking against Chakia and Chanel Dixon. (Defs.' Mot. Ex. 9 (Petition) and Ex. 12 (Complaint indicating date on which warrant was authorized).) Prosecutor Ange, who was dismissed from this action with prejudice pursuant to a stipulated order of dismissal, reviewed the Request for Petition, Warrant and Warrant Request and determined that there was sufficient evidence to authorize criminal charges against Chakia and Chanel Dixon. (Defs.' Mot. Ex. 10, August 30, 2011 Deposition of John Ange,

8

29:1-36:19.)

On February 28, 2008, Mrs. Henderson filed a Petition for Personal Protection Order against Chanel Dixon on behalf of Nicole, attaching in support of the Petition each of the reports that the Hendersons had made to the Eastpointe police.  (Pls.' Resp. Ex. 3 Petition for Personal Protection Order; Defs.' Reply Ex. 19, August 26, 2011 Deposition of Joyce Henderson, 36:19-37:24.)  The Petition states that Mrs. Henderson fears that Chanel will hurt her daughter or get someone else to hurt her. (Pls.' Resp. Ex. 3 Petition for PPO.)

On March 17, 2008, Judge Edward Servitto held a hearing in the Circuit Court for the County of Macomb on the Petition for a Protective Order.  (Defs.' Reply Ex. 18, Transcript of March 17, 2008 Hearing.)  Nicole Henderson and her mother Joyce appeared at the hearing along with Chanel Dixon and her mother Carolyn.  During the course of argument on the matter, while Judge Servitto was questioning Mrs. Henderson, Mrs. Dixon interjected, disrupting the proceedings to the point that Judge Servitto sent the Hendersons and the Dixons out of the courtroom while he finished addressing the other matters before him.  While Judge Servitto proceeded to handle other matters in the Court, a disturbance arose in the hallway outside the courtroom.  When Judge Servitto resumed the Henderson hearing, he charged Mrs. Dixon and another gentleman (Mrs. Henderson's boyfriend) with criminal contempt for creating a disturbance and disrupting court proceedings.  *Id.* at 6-10.  Judge Servitto ultimately decided not to issue the Personal Protection Order at that time because stalking charges were pending, but he ordered that no member of the Dixon family have any contact with Nicole Henderson until further order of the court.  (*Id.* at 13, 15; Pls.' Resp. Ex. 4, Macomb County Circuit Court Order.)  Judge Servitto made no findings on the issue of probable cause and never addressed the merits of the petition for a PPO.

9

On March 17, 2008, Detective McLaughlin appeared before Judge Norene S. Redmond in Macomb County 38th District Court and gave testimony in support of a request for a warrant on the criminal Complaint against Chanel Dixon for stalking. (Pls.' Ex. 1, Transcript of March 17, 2008 Hearing.)[3]  The Complaint presented to Judge Redmond referenced only the January 10, 2008 reported incident of stalking. (Defs.' Mot. Ex. 12.)  At the March 17, 2008 hearing, Detective McLaughlin explained the details of the January 10, 2008 incident and, in response to Judge Redmond's inquiry whether there had been prior reports, Detective McLaughlin responded that yes, there had been three or four of them. (Pls.' Ex. 1, Tr. 3/17/08 Hr'g at 4.)  Judge Redmond found probable cause and issued a criminal warrant for stalking against Chanel. (*Id*.; Defs. Mot. Ex. 12, Misdemeanor Warrant.)  Referee John Kennedy similarly authorized a Petition for Stalking against Chakia, a minor. (Defs.' Mot. Ex. 13.) Chanel Dixon was arrested at East Detroit High School on

---

[3] Plaintiffs state in their response that Defendant McLaughlin was present at the PPO hearing before Judge Servitto and knew, at the time he presented the warrant request to Judge Redmond (which Plaintiffs allege was held *after* the PPO hearing), that (allegedly) Judge Servitto had found no probable cause to issue a PPO and had denied the request for a PPO. (Pls.' Resp. 9-11.)  Plaintiffs suggest that Detective McLaughlin left Judge Servitto's hearing and rushed to request a warrant from Judge Redmond to get a "second bite at the apple" following Judge Servitto's denial of the PPO request.  These allegations are unfounded and wholly unsupported by the evidence.  First, the Exhibit on which Plaintiffs rely in support of the allegation that Detective McLaughlin attended the PPO hearing in no way indicates that he attended that hearing. (Pls.' Resp. Ex. 2, March 20, 2008 Memorandum from Detective McLaughlin to Lieutenant Borowsky, responding to Carolyn Dixon's March 18, 2008 Citizen's Complaint.)  Second, as discussed *infra* in section IIIA, Judge Servitto never reached the merits of the PPO, never made any findings as to "probable cause," and in fact ordered the Dixons to have no contact of any kind with the Hendersons.  Finally, a review of the transcripts of both hearings that day indicates that the warrant request before Judge Redmond began at approximately 1:10 p.m. and ended shortly thereafter. (Defs. Resp. Ex. 11.)  The hearing before Judge Servitto began at approximately 2:22 p.m. and ended close to 4:00 p.m., after Judge Redmond had found probable cause and issued the warrant.  Even if Detective McLaughlin had been present at the PPO hearing, which appears patently impossible based on the times indicated on the hearing transcripts, nothing transpired at the PPO hearing that would have in any way undermined or invalidated Detective McLaughlin's warrant request.  Quite the contrary, as explained *infra* in section IIIA.

March 20, 2008 and Chakia later surrendered on the Petition.

On March 20, 2008, Chakia Dixon filed a report at the Eastpointe Police Station about an incident that had occurred on November 21, 2007 at East Detroit High School. (Pls.' Resp. Ex. 21, 11/21/07 Eastpointe Crime Report.) Chakia reported that Dominique Henderson had passed by Chakia's first hour class and had threatened to "beat her ass." (*Id*.) Chakia informed Officer Golia, who took the report, that Dominique was suspended from school for the remainder of the year for the incident. *Id*. When Officer Golia asked Ms. Dixon why she waited so long to report the incident, she indicated that recent legal proceedings required her to make the report. *Id*.

Joyce Henderson, Nicole and Dominique's mother, ultimately decided that she was tired of the fighting between the families and "just wanted everything to be over." She informed the prosecutor that she did not want to continue to press criminal charges against the Dixons. (Defs.' Reply, Ex. 19, August 26, 2011 Deposition of Joyce Henderson, 41:6-42:15.) On July 21, 2008, Macomb County Prosecutor Dana Goldberg filed a motion to dismiss the stalking charges against Chanel Dixon without prejudice, citing insufficient facts to support the charge of stalking. (Pls.' Resp. Ex. 15.) Prosecutor Goldberg's motion indicates that Joyce Henderson was advised of the dismissal and told to contact Eastpointe Police if Chanel Dixon were ever to have contact with her daughter again similar to the conduct described in the January 10, 2008 police report. *Id*.

## II.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine

11

issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must

set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## III.   ANALYSIS

### A.   Defendant McLaughlin is Entitled to Qualified Immunity on Each of Plaintiffs' Claims Under 42 U.S.C. § 1983 (Counts III and IV)

"To successfully establish a claim under § 1983, a claimant must show that he or she was deprived of a right secured by the Constitution and the laws of the United States by one acting under the color of law." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir.1999) (internal quotation marks and citations omitted). "The Fourth Amendment requires that arrest warrants be issued only upon a showing of probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). Plaintiffs claim that Detective McLaughlin violated their right to be free from arrest without probable cause when he allegedly gave false information in support of his request for the issuance of the warrant and petition for the arrests of Chanel and Chakia Dixon.

Defendant McLaughlin argues that he is entitled to qualified immunity with respect to Plaintiffs' claims that he lacked probable cause to swear out the warrant. The doctrine of qualified immunity generally protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or

13

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Its purpose is "to shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" *Id*. at 847 (quoting *Malley*, 475 U.S. at 341)  (emphasis and corrected text in original).   "'Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.'" *Binay*, 601 F.3d at 647 (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

When qualified immunity is raised at the summary judgment stage, the Court must consider (1) whether the facts alleged demonstrate the violation of a constitutional right and (2) whether that right was clearly established at the time of the allegedly unlawful conduct:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable. . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The sequence of this inquiry as set forth in *Saucier*

is no longer mandatory and Courts are permitted to exercise their discretion in deciding which of

the two steps of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223,

236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to

exercise their sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand.").

Here, the Court ends its inquiry at the first step because Plaintiffs have failed to create a genuine

issue of material fact regarding Detective McLaughlin's probable cause to seek the warrant and

petition and therefore have failed to establish a violation of their constitutional rights.

> **1. Detective McLaughlin Had Probable Cause to Seek a Warrant for the Arrest of the Dixon Girls at the Time He Appeared Before District Judge Redmond**

Where qualified immunity is asserted, the issue of probable cause is one for the court since

'the entitlement is immunity from suit rather than a mere defense to liability.'" *Hunter v. Bryant*,

502 U.S. 224, 227-28, (1991). "Because an arrest based on a facially valid warrant approved by a

magistrate provides a complete defense" to a claim of false arrest, Plaintiffs here must "prove by a

preponderance of the evidence that in order to procure the warrant, [the officer] knowingly and

deliberately, or with a reckless disregard for the truth, made false statements or omissions that

create[d] a falsehood and such statements or omissions [we]re material, or necessary, to the finding

of probable cause." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (internal quotation marks

and citations omitted). "[A]n officer or investigator cannot rely on a judicial determination of

probable cause if that officer knowingly makes false statements and omissions to the judge such that

but for these falsities the judge would not have issued the warrant." *Vakilian v. Shaw*, 335 F.3d 509,

517 (6th Cir. 2003). "If the affidavit contains false statements or material omissions, we set aside

15

the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Sykes*, 625 F.3d at 305 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)). "[F]alse statements in a supporting affidavit do not invalidate the warrant if the remaining undisputed facts establish probable cause." *Burleigh v. City of Detroit*, 80 F. App'x 454, 458 (6th Cir. 2003).

Probable cause exists when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). *See also Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) ("[P]robable cause to arrest and prosecute is based on the facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense.") (internal quotation marks and citations omitted). "If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (citing *Scott v. United States*, 436 U.S. 128, 138 (197). "A valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent." *Id.*[4]

---

[4] While the parties briefed the issue of false arrest under both Michigan and federal law, Plaintiffs' Complaint (which is confusingly drafted) does not appear to rely on Michigan law in support of the False Arrest/False Imprisonment claim against Detective McLaughlin. (Compl. Count IV.) Plaintiffs' false arrest and false imprisonment claims set forth in Count IV appear to be based on federal, not state, law. Even if analyzed under Michigan law, however, the Court finds that Plaintiffs have failed to create any genuine issue of material fact that Detective McLaughlin had probable cause to believe that the Dixon girls had committed the offense of stalking, as that crime is defined under Michigan law, at the time he requested the warrant. "A false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant. To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 18

There is no evidence that Detective McLaughlin knowingly made material false statements to the District Judge in support of his request for the warrants against the Dixon girls for stalking under Michigan law.   Stalking is defined in Mich. Comp. Laws § 750.411h(1)(d), which states:

> "Stalking means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

Harassment, in turn, is defined as: "[C]onduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." Mich. Comp. Laws § 750.411h(1)(c).  "Unconsented contact" is defined as "any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued."  Mich. Comp. Laws § 750.411h(1)(e).  "Unconsented contact" includes, among other things, "[f]ollowing or appearing within sight of that individual," or "[a]pproaching or confronting that individual in a public place or on private property," or "[a]ppearing at that individual's work place or residence," or "[e]ntering onto or remaining on property owned, leased or occupied by that individual."  Mich. Comp. Laws § 750.411h(1)(e)(I)-(iv).  Michigan courts have recognized that two or more contacts in the course of a single day can constitute stalking.  *People v. White*, 212 Mich. App. 298, 881-82 (1995) ("Logically, defendant's repeated calls and threats made on June 9 were sufficient to establish the requisite course of conduct to support the felony stalking charge, i.e., a pattern of conduct composed

---

(2003).  Where the relevant facts are undisputed, the determination of probable cause is a question of law for the Court.  *Id*. at 19.

of a series of two or more separate noncontinuous acts evidencing a continuity of purpose. . . . Likewise, the ten calls and the threats that the victim received at work on July 17 may also constitute a course of conduct.")

It is undisputed that, on March 17, 2008, as Detective McLaughlin appeared before District Judge Redmond to secure the warrant and petition, he was aware of at least three reported incidents of harassing and threatening behavior. *See* Defs.' Mot. Ex. 3 (9/5/07 Report of Assault and Battery); Ex. 6 (1/10/08 Report of Stalking/Intimidation); Ex. 8 (2/6/08 Report of Stalking/Intimidation).[5] These reports, which were prepared by three separate Eastpointe police offers on distinct dates for distinct (and non-continuous) instances of conduct, two of which characterize the offense as "Intimidation/Stalking" and one which describes the offense as "Assault," provided sufficient probable cause for Detective McLaughlin to believe that the offense of stalking had been or was being committed by the Dixon girls.  The police reports indicate that the Hendersons felt intimidated, threatened or harassed, that in particular on the January 10, 2008 incident, Nicole took alternate routes, and called her mother on the phone, in an effort to avoid the intimidating behavior . *See* Mich. Comp. Laws §§ 750.411(h)(1)(c),(d).  Ultimately, Joyce Henderson felt sufficiently threatened to seek a personal protection order.  Even viewing the facts in the light most favorable to the Plaintiffs, they have failed to create a genuine issue of material fact that  "the facts and circumstances within [Detective McLaughlin's] knowledge and of which [he] had reasonably

---

[5] Plaintiffs do not dispute that Detective McLaughlin was aware of each of the reports at the time of the March 17, 2008 hearing before Judge Redmond.  Indeed, Plaintiffs complain that it was Detective McLaughlin who encouraged Mrs. Henderson to apply for a personal protection order and to attach in support each of the incident reports, which Mrs. Henderson did on February 28, 2008. (Pls.' Resp. Ex. 3, Petition for PPO and Attachments; Defs.' Reply Ex. 19, August 26, 2011 Deposition of Joyce Henderson, 52:17-53:17.)

trustworthy information [on March 18, 2008] were sufficient to warrant a prudent man in believing that the [Plaintiffs] had committed or [were] committing [the] offense [of stalking]." *Beck*, 379 U.S. at 91.       Notwithstanding the undisputed evidence that Detective McLaughlin had probable cause to seek the warrant and petition, Plaintiffs allege that probable cause is lacking because Detective McLaughlin materially misled the District Judge by presenting a warrant request that recited only one incident of stalking behavior, the January 10, 2010 incident when Chanel and Chakia drove by Nicole on her way home from school and gave her the finger and then returned, drove by again, and threatened to "kick [Nicole Henderson's] ass." (Defs.' Mot. Ex. 9.)  Plaintiffs argue that this incident standing alone could not support the warrant request and that Detective McLaughlin falsely testified before the Judge Redmond by responding, in answer to the District Judge's inquiry as to whether there were "prior reports" of such behavior, that there were "three or four of them" and by failing to disclose the September 4, 2007 and the February 6, 2008 Reports.

       "If the affidavit [offered in support of the warrant] contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause."  *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).  Setting aside the alleged "misrepresentation," i.e. that the "three or four" other incidents of stalking conduct of which Detective McLaughlin was aware had occurred *prior* to January 10, 2008, and including the allegedly omitted information, i.e. that similar reports had been made on September 4, 2007 and February 6, 2008, the Court concludes that the District Judge would have reached the same conclusion regarding probable cause to issue the warrant.

       First, the only aspect of Detective McLaughlin's statement that can be said to have been

"false" is the suggestion that there were "three or four" other incidents and that they had occurred *prior* to January 10, 2008. This alleged falsity simply was not material to the finding of probable cause. *See Valkilian*, 335 F. 3d at 517 (plaintiff must establish that "the allegedly false or omitted information was material to the finding of probable cause.") Had the District Judge been informed that in fact there had been only two additional reported stalking/threatening incidents, and that one had occurred on September 4, 2007 and one on February 6, 2008, these facts would still have supported a finding of probable cause. In fact, Prosecutor Ange was of the opinion that the January 10, 2008 Report, that was described at the warrant hearing, set forth sufficient facts standing alone to support a charge of stalking. As Michigan courts have held, the separate and non-continuous incidents of intimidating and threatening behavior (of which there need only be two or more) that constitute the offense of stalking need not even occur on separate days. *See White*, 212 Mich. App. at 881-82 (finding that repeated, but non-continuous, incidents of threatening behavior on a single day constituted a discrete stalking violation).

The January 10, 2008 Report was prepared by Officer Todd Murdock who was dispatched to the Henderson home "on a threats report." (Defs.' Mot. Ex. 3.) The Report further indicates that:

> Nicole said that on 1-10-08 at approximately 2:50 p.m. she was walking home from school when Shanell [sic] drove past her on 9 mile near Virginia. Nicole said that Shanell [sic] gave her the middle finger as she drove past. Nicole said that Shanell [sic] drove past several more times with Shakia [sic] in the car and several other girls. . . . Nicole said she went down some side streets and was almost home when Shanell [sic] pulled up to her about 5 house[] north of her house. Shanell [sic] and Shakia [sic] started yelling at Nicole that they were going to kick her ass. Nicole said she called her mother Joyce, and kept walking. At this point Joyce came out of the house and told Nicole to get inside. Joyce said that Shakia [sic] leaned out the passenger door and stated "We are going to kick her ass and then we will kick your ass." Joyce said that the vehicle a maroon SUV then drove of s/b Lambrecht. Joyce said she wrote down the license plate BPW6220. The plate came back to a 95 Chevrolet Blazer registered to Carolyn Dixon at 16135. I advised Joyce I would do a report and to call if they returned.

Defs.' Mot. Ex. 6. Detective McLaughlin repeated the substance of this Report to District Judge

Redmond at the hearing on March 18, 2008.

Prosecutor Ange testified that he believed that the January 10, 2008 incident, standing alone,

was sufficient to support a charge of stalking:

> Q:   Okay. Can you articulate for me in Plaintiff's Exhibit 2 [the January 10, 2008 Report] that conduct which is consistent with stalking?
>
> A:   Sure. Again, one of the young ladies identified as Nicole Henderson and also her mother indicates that the two young ladies, Chanel and Chakia Dixon had followed Nicole in her car and made I believe an obscene gesture with her hand.
>
> Q:   Okay.
>
> A:   And it looks as if the young ladies drove away and sometime later they came back and drove past her and then it further appears that sometime later, although the report doesn't indicate how long, sometime later, when Nicole was trying to get home through some back streets, that the other young ladies drove by once again, and were yelling at Nicole that they were going to assault her.
>
> Q:   So yelling – it is your testimony – it's your testimony that yelling you're going to assault someone, is consistent with stalking?
>
> A:   Well, in the context of this overall description of at least three incidents of driving past, making obscene gestures, screaming out threats and the mere fact that you're driving by to intimidate, certainly, in my opinion.

Defs.' Mot. Ex. 10, Ange Dep. 33:3-34:7. Thus, Detective McLaughlin, like Prosecutor Ange, could

reasonably have relied on this single Report to support probable cause to seek the stalking warrant.

But the Court need not decide that Detective McLaughlin *could* have relied on the January

10, 2008 Report alone in supporting his warrant request because the only relevant inquiry is what

facts Detective McLaughlin was aware of at the time he presented the warrant request to District

Judge Redmond.  "[P]robable cause determinations must be evaluated according to the information

21

the police knew at the moment of the challenged conduct . . ." *Peet v. City of Detroit*, 502 F.3d 557, 565 (6th Cir. 2007). Although only the January 10, 2008 incident was referenced in the warrant request, and only that incident was specifically described by Detective McLaughlin at the warrant hearing, it is undisputed that in fact he was aware that there had been at least one other incident of threatening behavior "prior" to January 10, 2008, i.e. the September 4, 2007 incident when Chanel and Chakia drove by Dominique and Nicole and one of the Dixon's friends reportedly jumped out of the car and assaulted Nicole as she was walking down the street, and an additional incident subsequent to the January 10, 2008 incident, on February 6, 2008. Thus, at the warrant hearing, as Detective McLaughlin accurately and honestly informed the Judge Redmond this had been "an ongoing problem," and in fact, "prior" to the date of the warrant hearing on March 17, 2008, there had been "three or four" incidents of threatening behavior, one prior to and one subsequent to the January 10, 2008, incident described in the warrant request.

Plaintiffs suggest that had the District Judge been made aware of the additional reports at the hearing, she would have found probable cause lacking. There is no basis in law or fact for this suggestion. There is no reason to believe that had the District Judge known the details of the other incidents of stalking of which Detective McLaughlin was aware, or that one of them had actually occurred subsequent to the January 10, 2008 incident, that her decision to issue the warrant would have been different. Indeed, knowledge of the specifics of the additional incidents of threatening behavior would have given the District Judge even more evidence on which to base her finding of probable cause. Plaintiffs' assertion that Detective McLaughlin purposely excluded the September and February reports from the warrant package because they contained information that was "exculpatory" to the Dixons, is not supported by any of the evidence and is factually incorrect - the

22

statements have no exculpatory value to the Dixons in this § 1983 action. As the Court noted at the hearing on this matter, there is nothing in the police reports (what Plaintiffs refer to as the "Henderson girls' statements") that could be considered exculpatory evidence favoring the Dixons in this § 1983 action.  The reports, none of which was prepared by Detective McLaughlin, specifically cite the offense as "intimidation/stalking" in two cases and "assault" in the third.  The reports detail the Dixon girls' threatening and intimidating behavior toward the Hendersons and it was objectively reasonable for Detective McLaughlin to rely on these reports, each authored by a different City of Eastpointe police officer, in seeking the warrant and petition.  "Probable cause exists if there is a "fair probability" that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000).  Plaintiffs have not carried their burden of establishing that Detective McLaughlin lacked probable cause or made materially false statements to the Judge Redmond in support of his request for a warrant against the Dixon girls.

Nor does the Court credit Plaintiffs' allegation that the decision of the Macomb County Circuit Court not to issue a PPO requested by Nicole Henderson should be construed as evidence that there was no probable cause for the warrant and that this information was wrongfully withheld from District Judge Redmond.  In fact, when the Dixons and the Hendersons were before Judge Servitto in Macomb County Circuit Court on March 17, 2008, on the issue of the PPO that was requested by Nicole Henderson, Judge Servitto admonished both parties for their behavior in court that day, held Carolyn Dixon and Nicole Henderson's boyfriend in criminal contempt for their disturbance in court that day and, in lieu of issuing the PPO, ordered that the Dixons not have any contact with the Hendersons until further order of the court:

> So while this is pending, on file number – what I'll do without issuing a PPO is you are not to have any contact as part of file number 2008-640-DL, and I'll prepare an

23

> order, that's my case, nor is any member of your family [speaking to Carolyn Dixon] to have any contact with Nicole Henderson until further order of this Court. Is that clear? . . . You'll get a copy of this order. There's not to be any contact. Do you understand that? Any contact, I take you right into juvenile.  Is that fair?

Defs.' Reply Ex. 18 (Transcript of March 17, 2008 PPO Hearing 13, 15.)  The Court repeated this admonishment in his written order: "Deny PPO on file 08-640 DL. Carolyn Dixon and all family members are not to have any contact with Nicole Henderson."  (Pls.' Mot. Ex. 4.)  Plaintiffs' assertion in their brief that "Judge Servitto determined that the conduct complained of was not consistent with stalking and denied the request for a PPO" is inaccurate, misleading and disingenuous.  (Pls.' Resp. 10.)  Judge Servitto made no such finding, made no "determination of no probable cause" as Plaintiffs assert in their brief and never addressed the merits of the PPO petition.  Far from substantiating Plaintiffs' claim that there was no probable cause for Detective McLaughlin to request the warrant, Judge Servitto's Order that none of the Dixons have any contact with Nicole Henderson supports the reasonable belief that stalking and intimidation, as evidence by the three police reports filed the Henderson's, had occurred.  Even assuming that Detective McLaughlin was aware of the outcome of the proceedings in Judge Servitto's courtroom the morning of March 17, 2008, an allegation that Plaintiffs have failed to support with evidence of evidentiary quality (*see supra* note 2), there is no reason to believe that knowledge of what transpired at that hearing would have affected his decision to seek the warrant.

In further support of their claim that Detective McLaughlin lacked probable cause for seeking the warrant for stalking/intimidation, Plaintiffs rely on the ultimate decision of a different Macomb County Prosecutor, Dana M. Goldberg, on July 21, 2008, to dismiss the stalking charges for failure of sufficient facts to support the element of "two or more separate non-continuous acts evidencing a continuity of purpose."  (Pls.' Resp. Ex. 15, July 21, 2008 Mot. to Dismiss Complaint

Without Prejudice.) However, the decision made by Ms. Goldberg, who importantly was never deposed in this matter regarding her decision to dismiss the charges, months after Detective McLaughlin sought the warrant based on the facts known to him at the time, is simply not relevant to Detective McLaughlin's and Prosecutor Ange's decision in February, 2008 to file the stalking charges, a decision which was supported by knowledge of at least three incidents of stalking and harassing behavior.[6] The fact that the stalking charges ultimately were dropped does not amount to evidence in this § 1983 case that Detective McLaughlin made knowing and material false statements in support of the warrant and petition requests. *See Manley v. Paramount's Kings Island*, 299 F. App'x 524, 530 (6th Cir. 2008) (holding that "even when a state court dismissed a charge for lack of probable cause to prosecute, a federal court in a subsequent § 1983 action for Fourth Amendment violations should not entertain a § 1983 suit if it finds no genuine issue of material fact as to probable cause to arrest" ). Moreover, it is clear from statements made in Prosecutor Goldberg's motion to dismiss the charges, importantly *without prejudice*, that it was her belief that the conduct reported in the January 10, 2008 report described the type of conduct that could support a stalking charge. In that Motion, Prosecutor Goldberg states that Joyce Henderson "was advised to contact the Eastpointe Police Department if the Defendant were to again have similar contact with her such as occurred on January 10, 2008." (Pls.' Resp. Ex. 15, ¶ 6.) As Detective McLaughlin was aware, at the time he appeared before District Judge Redmond, based on the police reports of

---

[6] The Court notes that at the hearing on this matter, counsel for the Defendants explained that the Hendersons asked that the criminal charges against the Dixon's be dismissed, suggesting that this may have had a bearing on Prosecutor Goldberg's decision to drop the charges. Ms. Henderson confirmed this in her deposition . (Defs.' Reply, Ex. 19, Carolyn Henderson Dep. 40:3-42:15.) Any factual disputes regarding the basis for Ms. Goldberg's decision to dismiss the charges, however, are not material to this Court's qualified immunity determination.

September 4, 2007 and March 6, 2008, similar (indeed significantly more threatening) conduct had been reported to the Eastpointe police.  Plaintiffs have proffered no evidence to create a genuine issue of material fact that the conduct described in those police reports is the type of conduct that prosecutors would consider sufficient, if occurring more than once on a non-continuous basis, to support a charge of stalking under Michigan law.[7]

Plaintiffs also suggest that Detective McLaughlin was acting "in retaliation" for the Citizen's Complaint that Carolyn Dixon had filed against him on September 25, 2007, which complained of an incident that occurred in the parking lot of a strip mall next to the high school the girls attended.

---

[7] At the hearing on this matter, Plaintiffs' counsel suggested that certain statements given by the Henderson girls at the time that the 9/5/07 Report was prepared were not produced to counsel in the criminal case in state court.  (Pls.' Resp. Exs. 6, 9.)  Although Plaintiffs have produced no evidence to support this claim, even if true, the fact that certain material may not have been properly produced during discovery in the criminal case does not create a question of fact in this case as to what materials Detective McLaughlin was aware of at the swear to or what materials the prosecutor had in his possession at the time the warrant request was approved.  The content of these statements, each of which indicates that it was given in connection with Complaint No. 07-12918 ( the 9/5/07 Report), is entirely consistent with Officer Sommerfeld's recitation of the facts in his 9/5/07 Report. Plaintiffs have failed to support their suggestion that these underlying statements were never provided to the prosecutor's office with "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey*, 106 F.3d at 145; *Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). In any event, regardless of whether they were produced in the criminal case, a matter that need not detain this Court, the statements are consistent with and entirely reflected in the official 9/5/07 Report.  Knowledge of these statements would not have affected the underlying finding of probable cause and does not alter this Court's probable cause analysis.  Plaintiffs' counsel's belief, expressed to the Court at the hearing on this matter, that the factual matter contained in the statements relating to the 9/4/07 incident would have been somehow exculpatory or insufficient to establish the crime of stalking is not factually or legally substantiated and does not alter this Court's determination that Detective McLaughlin reasonably believed, at the time he appeared before Judge Redmond, based on the information known to him as reflected in the police reports, that there was probable cause to support his warrant request.  District Judge Redmond confirmed the reasonableness of this belief by authorizing the warrant and petition based on the nature of the conduct described to her at the probable cause hearing.  Indeed, Prosecutor Goldberg, when dismissing the stalking charges *without prejudice*, indicated that another incident like that described in the January 10, 2008 Report would be grounds for further criminal action.  (Pls.' Resp. Ex. 15,  ¶ 6.)

Plaintiffs have offered no evidence, other than their own speculation, that this Citizen's Complaint, which was investigated by Lieutenant Borowsky of the Eastpointe Police Department, had any effect on Detective McLaughlin's decision six months later to swear out a warrant against the Dixon girls. In any event, Detective McLaughlin's subjective intent in seeking the warrant is irrelevant to this Court's finding of probable cause.  "[An officer's] actual motives or beliefs are irrelevant for purposes of the probable cause issue." *Criss*, 867 F.2d at 262 (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.")).  Additionally, it is noteworthy that the September 25, 2007 Citizen's Complaint also was filed against a female Officer Gibson, based upon a separate incident that occurred two days before the incident involving Detective McLaughlin.  Also, there is no evidence that Detective McLaughlin was ever disciplined based on this complaint, which was investigated according to Eastpointe Police Department procedures.  Finally, six months passed between the filing of this Citizen's Complaint and the March 17, 2008 probable cause hearing, during which time the Hendersons had reported several additional incidents of intimidating behavior by the Dixons.

The Court also notes that any suggestion that this was some kind of a personal vendetta by Detective McLaughlin against the Dixons is belied by the fact that none of the incident reports that supported Detective McLaughlin's decision to seek the warrant and petition was authored by Detective McLaughlin.  The reporting officers were Officer Sommerfeld (Defs.' Mot. Ex. 3), Officer Murdock (Defs.' Mot. Ex. 6) and Officer Diegel (Defs.' Mot. Ex. 8.)   As evidence that Detective McLaughlin favored the Hendersons, Plaintiffs point out that Detective McLaughlin failed to apprise

the Judge Redmond that on one occasion in September, 2007, Nicole Henderson admitted that she drove by the Dixons and threw a plastic bottle at the Dixon's car. (Pls.' Resp. Ex. 31.) However, the fact that the Hendersons also may have been guilty of threatening behavior toward the Dixons does not diminish the fact that Detective McLaughlin had probable cause to charge the Dixons based on a series of separate reported incidents of threatening behavior by the Dixons against the Hendersons. Plaintiffs have not proffered evidence sufficient to satisfy Rule 56 to support the suggestion that Detective McLaughlin was retaliating against the Dixons in favor of the Hendersons is simply not supported by any of the evidence. In fact it was Detective McLaughlin who criminally charged Nicole Henderson in the original assault case against Chanel Dixon. In any case, as noted, Detective McLaughlin's motives are irrelevant in the face of the objective and undisputed evidence supporting a finding of probable cause.

Plaintiffs concede that the test for § 1983 liability in this case, and the singular issue before this Court in Plaintiffs' § 1983 claim against Detective McLaughlin, is whether he made "material false statements, either knowingly or in reckless disregard for the truth," in presenting his case for a warrant to Judge Redmond. (Pls.' Resp. 8.) Detective McLaughlin had probable cause to seek a warrant against the Dixon girls for stalking because "the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [Plaintiffs] had committed or [were] committing [the offense of stalking]." *Beck*, 379 U.S. at 91. While Plaintiffs claim that Detective McLaughlin's preparation of the warrant request based on only one reported incident of stalking was insufficient to establish probable cause and also claim that he misrepresented the number of prior stalking incidents at the warrant hearing, had District Judge Redmond been informed that in fact there had been two, not

28

three, additional incidents of stalking and that one had occurred before and one after January 10, 2008, and had she been further informed of the allegedly omitted information, i.e. the details of the September 4, 2007 and the March 6, 2008 reports, the case for finding probable cause would have been stronger, not weaker.  Even excising the allegedly misrepresented information and including the allegedly omitted information, there would have been probable cause.  *See Wilson*, 212 F.3d at 786-87, 787 n. 4.  Therefore, even resolving all genuine material factual disputes in Plaintiffs' favor, Plaintiffs have failed to establish that Detective McLaughlin violated their constitutional rights.

> **2.    Even Assuming That Plaintiffs Have Created a Genuine Issue of Material Fact as to the Existence of Probable Cause, Detective McLaughlin is Still Entitled to Qualified Immunity Because He Reasonably Believed That There Was Probable Cause to Seek the Warrants for Stalking**

Even were the Court to conclude that the facts alleged by the Plaintiffs created a factual issue as to the violation of Plaintiffs' constitutional rights, Detective McLaughlin would still be entitled to qualified immunity because there is no clearly established right to be free from arrest for stalking under Michigan law when the warrant request is supported by three separate police reports of threatening/intimidating behavior, prepared by three separate officers on three distinct occasions and the warrant request is independently reviewed and approved by the County Prosecutor who, not insignificantly, has been dismissed *with prejudice* from this case by stipulation of the Plaintiffs. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344 (1986) (internal citations omitted).  The very fact that at least two other officers prepared reports of an offense of Intimidation/Stalking based on the conduct described to them on January 10, 2008 and February 6, 2008, substantiates that officers of reasonable competence would agree that the conduct described in those reports constituted stalking under Michigan law.  In addition, the

Macomb County prosecutor approved the warrant request and testified to his belief that the conduct complained of in each of the separate reports amounted to stalking as that crime is defined under Michigan law.  Notably, although a subsequent Macomb County Prosecutor dismissed the stalking charges *without prejudice*, her motion to dismiss the charges indicated that the conduct described in the January 10, 2008 Report, were it to be repeated, could be grounds for further criminal action.

Given the knowledge with which Detective McLaughlin was armed, the Court cannot conclude that no reasonably competent officer would have acted as he did in seeking the warrant and petition to arrest.  Detective McLaughlin's motives, which Plaintiffs question, are irrelevant where officers of reasonable competence would have concluded that a warrant should issue.  Even "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner."  *Malley*, 475 U.S. at 341.  "In the context of a qualified immunity determination, this Court need not find that probable cause actually existed to issue an arrest warrant, nor that Defendant [McLaughlin] so believed, but only that 'officers of reasonable competence could disagree' on the existence of probable cause."  *Ireland v. Tunis*, 907 F. Supp. 1088, 1103 (E.D. Mich. 1988) (quoting *Malley*, 475 U.S. at 341).  Qualified immunity protects "all but the plainly incompetent," and, even assuming a constitutional violation, would shield Detective McLaughlin in the instant case.

**B.**     **Plaintiffs 42 U.S.C. § 1983 Claims Against the City of Eastpointe Based Upon an Alleged Custom or Policy Fail (Counts V and VI)[8]**

A plaintiff may bring a § 1983 claim against a municipality or local government. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  However, a municipality cannot be held liable pursuant 42 U.S.C. § 1983 on a theory of *respondeat superior. Monell*, 436 U.S. at 691-95; *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).  To prevail on a municipal liability claim, the plaintiff must show that the alleged violation of his federal rights was caused by a municipal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *see also Monell*, 436 U.S. at 692 (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy).   The causal link must be strong enough to support a finding that the defendants' deliberate conduct can be deemed the "moving force" behind the violation. *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).   Thus, a plaintiff asserting a § 1983 claim on the basis of municipal custom or policy must identify the policy, connect the policy to the municipality, and show that the specific injury at issue was caused by the execution of that policy. *Graham*, 358 F.3d at 383. As a result, Plaintiffs must identify a specific policy,

---

[8] It appears to the Court that Plaintiffs assert a *Monell* claim against the City of Eastpointe in Count VI of the Complaint, although they appear to conflate the concept of "supervisory liability" with *Monell* liability.  In any event, because Detective McLaughlin is alleged to have directly participated in the conduct that forms the basis for Plaintiffs' Complaint, the Court does not construe the Complaint to assert a claim based on supervisory liability.  Similarly confusing is Count V, which is captioned "Constitutional Deprivation Individual Law Enforcement Officer Defendant Derek McLaughlin."  (Compl. 9.)  This Count goes on to describe conduct of "defendants" and "City of Defendant Eastpointe."  *Id.*  Accordingly, the Court construes Counts V and VI collectively as alleging a *Monell* practice or policy claim.

31

custom or practice of the City of Eastpointe police department that was the "moving force" behind their injuries.

In *Thomas*, the Sixth Circuit identified four ways a plaintiff may prove the existence of an illegal policy or custom. 398 F.3d at 429. The plaintiff can point to (1) the government's legislative enactments or official policies; (2) actions by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom or practice of tolerating the violation of federal rights by its officers or agents. *Id.* Where no formal policy exists, the critical inquiry is whether there is a policy or custom that although not explicitly authorized "is so permanent and well settled as to constitute a custom or usage with the force of law." *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)).

Plaintiffs claim that the City of Eastpointe Police Department "customs, practices and/or policies" led to a deprivation of Plaintiffs' constitutional rights. The basis for the claim appears to be that the City failed to adequately train its officers on the procedures for effectuating an arrest with probable cause. Plaintiffs, however, identify no custom, policy or practice. In fact, as Detective McLaughlin testified in his deposition, there was no such "policy" because officers are aware that they are bound by the legal principles governing probable cause and adhere to those principles when swearing out warrants. There is no need for a "policy" that governs the "steps" to be taken in seeking a warrant, a process guided by the constitutional constraints of which they are well aware. Moreover, Plaintiffs present no evidence of other instances of alleged failures to support warrant requests with probable cause, i.e. there is no evidence of a pattern of such conduct or a history of such failures. "[N]o reasonable juror could find on the basis of [one] discrete incident[] that a

32

city-wide policy or custom of unconstitutional [arrests without probable cause] was in place." *Peet*, 502 F.3d at 567.

Plaintiffs provided no evidence to establish a genuine issue of material fact on their suggestion of a failure to train claim which requires proof that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendant's deliberate indifference; (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted). Plaintiffs took no discovery on this claim and have provided no evidence regarding the training provided to Eastpointe police officers on swearing out warrants or any other practice, custom or policy.

Plaintiffs have "supplied too little Rule 56 evidence to create a genuine issue of material fact" regarding any theory of municipal liability. *Peet*, 502 F.3d at 567. Moreover, the failure to establish a constitutional violation against Detective McLaughlin is fatal to any claim that Plaintiffs may have against the City of Eastpointe. *Peet*, 502 F.3d at 566 (holding that "the City of Detroit cannot be liable under § 1983 for police conduct that inflicts no constitutional injury"); *Scott v. Clay County, Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("Our conclusion that no officer-defendant had deprived the Plaintiff of any constitutional rights a fortiori defeats the claim against the County as well.").

33

**C.      The City of Eastpointe is Immune From Tort Liability on Plaintiffs' State Law Claims**

Defendants argue that the City of Eastpointe is immune from liability for Plaintiff's state law claims under the Government Tort Liability Act ("GTLA"), Mich. Comp. Laws § 691.1407 ("Section 7"). (Defs.' Mot. 14-16.) In the GTLA, the Legislature clearly stated, "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function." *Mack v. City of Detroit*, 467 Mich. 186, 195 (2002) (quoting §1407(1)). As a result, an agency is immune unless the GTLA specifically permits a civil suit by citizens. *Id.* In *Mack*, the Michigan Supreme Court identified five exceptions to governmental immunity for an agency. *Id.* at 195 n. 8. They are the "highway exception," Mich. Comp. Laws § 691.1405; the "motor vehicle exception,"§ 1405; the "public building exception," § 1406; the "proprietary function exception," § 1413; and the "governmental hospital exception," § 1407(4). *Id.* The Legislature has also codified one other exception, the "sewage disposal system event exception." § 1416.

Plaintiffs appear to concede that the acts alleged in their Complaint do not fall within any of the recognized exceptions and admit that they are not asserting a tort claim against the City. (Pls.' Resp. 17.) Accordingly, the Court need not analyze this claim.

**D.      Detective McLaughlin is Immune from Individual Liability on Plaintiffs' State Law Gross Negligence Claim (Count I)**

The Michigan Supreme Court has articulated the test for determining whether an individual defendant is entitled to governmental immunity for negligent conduct under Michigan state law in *Odom v. Wayne County*, 482 Mich. 459 (2008). The *Odom* court clarified the intersection between Section 7 of the GTLA (gross negligence) and *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984)

34

(intentional torts).  *Odom*, 482 Mich. at 467-68.  In 1984, *Ross* comprehensively described the common-law test for individual governmental immunity for all tort actions.  *Id.* at 468.  The Michigan Supreme Court held that judges, legislators, and the highest executive officials of all levels of government were immune from all tort liability when acting within the scope of their governmental authority.  *Ross*, 420 Mich. at 633.  Lower-level officials were immune under the theory of qualified immunity if: their acts were taken during the course of employment and within the scope of that employment; they were taken in good faith; and they were discretionary/decisional, but not ministerial/operational.  *Id.* at 633-34.

In 1986, the Michigan State Legislature amended the GTLA in response to *Ross*.  *Odom*, 482 Mich. at 468.  Section 7(2) affords individual immunity to government officials "without regard to the discretionary or ministerial nature of the conduct in question," when the actions were in the course of employment and (a) the employee "is acting or reasonably believes he or she is acting within the scope of his or her authority;" (b) while discharging a governmental function; and (c) the conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." *Id.* at 468-69.  The Sixth Circuit recently instructed that under Michigan law, "[s]tatutory grants of government immunity should be broadly construed, with exceptions construed narrowly."  *Smith v. County of Lenawee*, 600 F.3d 686, 690 (6th Cir. 2010).  Gross negligence is defined in the statute "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a).

Plaintiffs' claim of gross negligence fails because there is no evidence that Detective McLaughlin's conduct approached the level of recklessness defined by the Michigan Supreme Court in *Odom*.  Detective McLaughlin relied on reports of intimidating/threatening behavior authored by

three separate officers in making his decision to seek a warrant (and petition) for the Dixon sisters for stalking. Detective McLaughlin then submitted those same reports to prosecutor Ange who independently reviewed the materials and came to his own conclusion to authorize Detective McLaughlin to seek the warrants based on his separate review of those same materials. Judge Redmond then granted the request and issued the warrants based on these same facts. Detective McLaughlin is entitled to immunity on Plaintiffs' gross negligence claim.

### E.   Plaintiffs Have Failed to Establish a Claim for Malicious Prosecution (Count VII)

A malicious prosecution claim under Michigan law requires "proof of four elements: (1) a defendant's initiation of criminal proceedings against a plaintiff; (2) termination of the proceedings in plaintiff's favor; (3) absence of probable cause for initiation of the proceedings; and (4) initiation was done with malice ( i.e., the primary purpose was other than bringing plaintiff to justice)." *Radzinski v. Personal Representative of Jennifer Carlson*, 469 Mich. 1037 (2004). Plaintiffs' failure to establish a lack of probable cause is fatal to their malicious prosecution claim. *Peterson*, 259 Mich. App. 1, 22-23 (affirming dismissal of both state and federal malicious prosecution claim where probable cause was found to exist).

Plaintiffs' allegations regarding malicious prosecution rely in part on the claim that Detective McLaughlin omitted information in his warrant request that would have implicated the Henderson girls. However, as the Court has already determined, the statements made by the Henderson girls contain no information that would be considered exculpatory and the fact that the Hendersons may have engaged in intimidating behavior toward the Dixons does not indicate a lack of probable cause to file such charges against the Dixons. Nor does it indicate that Detective McLaughlin, who was acting on the reports of three separate officers, initiated the warrant for a primary purpose other than

36

halting the repeated intimidating and threatening behavior by the Dixon girls against the Henderson girls, as reported to the City of Eastpointe police.

### F.      Plaintiffs Have Failed to Establish a Claim of Intentional Infliction of Emotional Distress (Count II)

To establish a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must prove: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Duran v. Detroit News, Inc.*, 200 Mich. App. 622, 629-30 (1993) (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985)).  "The trial court must determine as a matter of law whether the defendant's conduct was so extreme and outrageous to withstand a motion for summary disposition." *Id.*  Liability will only be found when the defendant's conduct is so outrageous and extreme that it goes beyond all bounds of decency and is "to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v. Mills*, 212 Mich. App. 73, 91 (1995) (citing *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342 (1993)).  The conduct must make the average member of the community exclaim "Outrageous!" when described to her. *Id.*; *see also Roberts*, 422 Mich. at 603.

There is absolutely no evidence to sustain this claim.  Detective McLaughlin's decision to seek a warrant and petition against the Dixon sisters based on three separate reports of intimidating and threatening behavior by them against the Hendersons was far from "outrageous" and does not support a claim of intentional infliction emotional distress.

## IV.     CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment and DISMISSES Plaintiffs' Complaint with prejudice.

IT IS SO ORDERED.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 29, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 29, 2012.

S/Denise Goodine
Case Manager